UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Krista Hudson,

   Plaintiff,

  v.            Civil Action No. 5:10-CV-300

Commissioner of Social Security,

   Defendant.

## **REPORT AND RECOMMENDATION**
(Docs. 11, 15)

  Plaintiff Krista Hudson brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security ("Commissioner") denying her application for disability insurance

benefits.  Pending before the Court are Hudson's motion to reverse the Commissioner's

decision (Doc. 11), and the Commissioner's motion to affirm the same (Doc. 15).  For the

reasons stated below, I recommend that Hudson's motion be GRANTED, the

Commissioner's motion be DENIED, and the matter be remanded for further proceedings

and a new decision.

## **Background**

  Hudson was twenty-six years old on the alleged disability onset date of

October 1, 2007.  (AR 37, 71, 167, 178.)  She completed school through the twelfth

grade, receiving poor grades and attending special education classes beginning in the fifth

grade.  (AR 38-39, 176, 279-85, 777.)  She has work experience as a cashier, a cook, a daycare provider, a telephone operator, a fitting room attendant, and a taxi driver.  (AR 40, 59, 168, 176.)  Hudson is married, and lived with her husband and two stepchildren during the alleged disability period.  (AR 38.)  The record reflects that she has a past history of trauma and abuse by family members, both as a child and in her adulthood (AR 299, 696, 1001, 1004-05), and that her infant daughter died in 2001 from Sudden Infant Death Syndrome ("SIDS") (AR 299, 558, 696).

On April 9, 2008, Hudson filed applications for supplemental security income ("SSI") and disability insurance benefits ("DIB").  (AR 151-61.)  The applications were denied initially and on reconsideration.  (AR 69-85.)  Pursuant to her DIB application, Hudson alleges that she became disabled on October 1, 2007 as a result of her diabetes, manic depression/bipolar disorder, migraine headaches, and obesity.  (AR 167.)  On May 5, 2010, Administrative Law Judge ("ALJ") Dory Sutker conducted a hearing on Hudson's application.  (AR 30-68.)  Hudson appeared and testified, and was represented by counsel.  (*Id.*)  Vocational expert ("VE") Howard Steinberg also appeared and testified.  (AR 56-67.)  Hudson stated at the hearing that she could not work because of lower back and neck problems, heat exhaustion, tendonitis in her elbow, carpel tunnel syndrome in her wrist, and diabetes in remission.  (AR 41.)  She also stated that she had weight problems, despite having lost 150 pounds after undergoing gastric bypass surgery in November 2009.  (*Id.*; *see also* AR 44, 1215.)  In addition, Hudson reported that she had approximately one or two seizures each month (AR 45-46); she had problems sleeping, requiring her to wear a CPAP mask every night and resulting in a narcolepsy

diagnosis (AR 46-47); and she had migraine headaches lasting "[a] couple hours" "a couple times a day" (AR 49-50). Hudson further reported that she had mental health issues, including problems with anger and manic depression. (AR 47.)

On June 30, 2010, the ALJ issued a decision finding that Hudson was not disabled under the Social Security Act from her alleged onset date of October 1, 2007 through the date of the decision. (AR 11-22.) On October 20, 2010, the Decision Review Board notified Hudson that it had not completed its review of the claim during the time allowed, making the ALJ's decision final. (AR 1-3.) Having exhausted her administrative remedies, Hudson filed her Complaint in this case on December 9, 2010. (*See* Doc. 4.)

## ALJ Determination

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's "residual functional capacity" ("RFC") precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The fifth and final step requires the ALJ to determine whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional capacity").

Employing this sequential analysis, ALJ Sutker first determined that Hudson had not engaged in substantial gainful activity since her alleged onset date of October 1, 2007. (AR 14.) At step two, the ALJ found that Hudson's affective disorder, anxiety disorder, sleep apnea, obesity, non-epileptic psychogenic seizures, and type II diabetes mellitus were severe impairments. (*Id.*) Conversely, the ALJ found that Hudson's migraine headaches did not constitute a severe impairment, and that Hudson's back pain and "self-reported" bipolar disorder were not "medically determinable." (AR 14-15.) Next, the ALJ determined that Hudson did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (AR 15-16.)

The ALJ then determined Hudson's RFC, finding that she was able to perform "a full range of work at all exertional levels" but with nonexertional limitations, including

4

that she could not be exposed to unprotected heights, dangerous machinery, and power tools; she must avoid driving on the job; and she must avoid climbing ropes, scaffolds, and ladders.  (AR 16-17.)  Additionally, the ALJ determined that Hudson would be "limited to routine and repetitive tasks with brief and superficial contact with the general public, co-workers[,] and supervisors."  (AR 17.)  At step four, relying on the VE's testimony, the ALJ found that Hudson was capable of performing her past relevant work as a fitting room attendant and a cashier.  (AR 20.)  Alternatively, at step five, again relying on the VE's testimony, the ALJ found that "there are other jobs existing in the national economy that [Hudson] is also able to perform," including the jobs of janitor, hand packer, hospital cleaner, office mail clerk, and chambermaid.  (AR 20-21.)  The ALJ concluded that Hudson had not been under a disability, as defined in the Social Security Act, from October 1, 2007, the alleged onset date, through the date of her decision.  (AR 21-22.)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §

5

423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

Although the reviewing court's role with respect to the Commissioner's disability decision is "quite limited[,] and substantial deference is to be afforded the Commissioner's decision," *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quotation marks and citation omitted), the Social Security Act "must be construed liberally because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits," *Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999); *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981) ("In its deliberations the District Court should consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied.").

## Analysis

## I.     The ALJ Erred in Her Consideration of Hudson's Migraine Headaches.

The regulations define a "severe" impairment as one "which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  Despite this somewhat stringent language, the Second Circuit has held that the ALJ's step two severity analysis "may do no more than screen out *de minimis* claims."  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995).  In accord, the Social Security Administration has used lenient language in describing the claimant's burden of demonstrating a "severe" impairment:

> An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at [step two of the sequential evaluation] when medical evidence establishes *only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work* even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has *no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities*).

SSR 85-28, 1985 WL 56856, at *3 (1985) (emphases added).  In this case, the ALJ found that Hudson's alleged impairment of migraine headaches was "non-severe," meaning Hudson's headaches had no more than a minimal effect on her ability to work.  (AR 15.) The ALJ justified this finding by stating that "a CT scan was completely normal" and "in April 2009, a CT scan was again normal."  (*Id.*)  The ALJ concluded: "Because the objective medical record does not document continuing and significant limitations based on [Hudson's] headaches, I find that this alleged impairment is non-severe."  (*Id.*)

The language used in the ALJ's decision reveals that the ALJ based her determination that Hudson's headaches did not constitute a severe impairment on her finding that no objective medical evidence documented Hudson's headaches.  In addition, the Commissioner contends that the ALJ's determination regarding Hudson's headaches was based on the ALJ's finding that Hudson was not entirely credible.  (Doc. 15 at 10.) But the ALJ did not specifically find that Hudson's headache complaints were not credible, instead vaguely stating in the context of her RFC determination that "[Hudson's] statements concerning the intensity, persistence[,] and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above [RFC]."  (AR 18.)  Nowhere in the RFC-determination portion of her decision did the ALJ discuss Hudson's headaches; thus it is does not appear that this credibility determination applied to Hudson's particular complaints regarding her headaches.

Moreover, the ALJ's requirement that objective medical evidence support Hudson's complaints of headaches is not supported by the law.  In fact, generally, "'objective' findings are not required in order to find that an applicant is disabled." *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003).  The Second Circuit has stated: "It has been established, both in this Circuit and elsewhere, that subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence."  *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  This law particularly applies with respect to headaches, which are often not reflected in laboratory tests or other medical evidence.  One court explained: "Since present-day laboratory tests cannot prove the existence of migraine

headaches, . . . medical signs [such as nausea, vomiting, photophobia, dizzy spells, and black outs] are often the only means available to prove their existence." *Ortega v. Chater*, 933 F. Supp. 1071, 1075 (S.D. Fla. 1996). Of course, the ALJ is not obliged to accept without question the credibility of a claimant's subjective evidence, but if the ALJ declines to find such evidence credible, he or she must explain the reasons for such finding. *Marcus*, 615 F.2d at 27. Here, as stated above, there is no indication in the ALJ's decision that she considered the credibility of Hudson's headache-related complaints. In a similar situation, the Second Circuit found in favor of the plaintiff, explaining as follows:

> If . . . the ALJ in fact did not consider the credibility of appellant's claims of disabling pain, but instead rejected her claims on the ground that objective, clinical findings did not establish a cause for such intense pain, then in our view the Secretary's decision was premised on an erroneous legal standard, and we must reverse. Disregard of a claimant's subjective complaints of pain . . . is not justified solely because there exists no objective evidence in support of such complaints.

*Id.* (quotation marks omitted).

Notwithstanding the ALJ's failure to assess Hudson's credibility with respect to her headache complaints and the ALJ's improper reliance on the lack of objective medical evidence to support those complaints, substantial evidence does not support the ALJ's finding that Hudson's headaches constitute merely a non-severe impairment, i.e., an impairment causing "only a slight abnormality" and having "no more than a minimal effect on [Hudson's] ability to work." SSR 85-28, 1985 WL 56856, at *3. As noted in the ALJ's decision, at the administrative hearing, Hudson testified about the severity of her headaches, stating that they are "so severe that she becomes dizzy and disoriented"

9

(AR 14 (citing AR 167)); that they cause her an "aching, stabbing, and throbbing" pain "four times per week for four to five hours each [time]" (AR 14 (citing AR 203)); and that they may cause her to "become dizzy or sick and . . . [to] experience blurry vision, aches, and sensitivity to light and noise" (AR 14-15 (citing AR 203)).  There is ample documentation in the medical record supporting this testimony and reflecting Hudson's consistent complaints of migraine headaches during the alleged disability period.[1]  (*See, e.g.,* AR 363-65, 416, 423, 425, 427, 430, 510-12, 545, 564, 571, 678, 698, 950-51, 955, 965-66, 980, 982, 1223.)

For example, as noted in the ALJ's decision (AR 15), a March 2008 medical report documents that Hudson presented to the emergency room "in severe distress" due to a migraine headache that was "abrupt in onset"; "like [her] prior headaches, but much worse"; and causing "photophobia, nausea[,] and vomiting" (AR 510-11).  Hudson was diagnosed with "[a]cute headache" and advised to "get plenty of sleep, work on stress reduction," and refrain from working "for two days."  (AR 512.)  Another medical note from earlier that month states that Hudson presented with complaints of vomiting for days which was associated with diarrhea and headache.  (AR 430.)  Yet another medical record from March 2008 documents Hudson's recurrent migraine headaches, describing them as causing "moderate to severe sharp pain, tightness[,] and pulsation."  (AR 423.)  Hudson was prescribed Maxalt and instructed to take the medication "at first sign of [h]eadache."  (AR 427.)  In a July 2008 disability evaluation report, Hudson's headaches

---

[1]  The Commissioner even admits that "the record certainly documents Hudson's complaints of debilitating migraines," and cites to some of the relevant evidence.  (Doc. 15 at 10 (citing AR 423, 698, 984, 1148, 1223).)

were described by psychologist Dr. Dean Mooney as follows:

> [Hudson] . . . reported having a history of migraine headaches, which
> coincides with medical records.  She stated that these headaches occur
> sporadically.  When she is experiencing a migraine headache, [Hudson]
> lays in her bed in complete silence, with the curtains closed.  She stated that
> although she is prescribed Maxalt for these symptoms, sometimes the
> medication does not stop the headaches, at which point they can last for 4-5
> days consecutively.

(AR 698.)  Approximately one year later, a May 2009 medical note from neurologist Dr.
Kris Bujarski records that, among other medical issues, Hudson had "frequent
headaches."  (AR 966.)  In February 2010, despite having had gastric bypass surgery a
few months earlier, Hudson reported to Dr. Bujarski that she was having migraine
headaches "nightly" with "throbbing" and "photophobia."  (AR 982.)  Hudson's
medication dosage was increased.  (AR 984.)  A May 2010 medical report prepared by
APRN Maureen Quigley states that there was "no improvement" in Hudson's migraine
headaches despite her recent significant weight loss.  (AR 1223.)  Despite this evidence,
the ALJ failed to find Hudson's headaches "severe" at step two, and then failed to
consider them at later steps in the evaluation process.

   The Commissioner argues that any error the ALJ may have made at step two was
harmless because the ALJ found other impairments severe and thus proceeded to the next
step.  It is true that, in general, an ALJ's failure to make an explicit finding of a step two
impairment where substantial evidence supports the presence thereof, does not in and of
itself require remand.  *See, e.g., Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803
(6th Cir. 2003).  However, where the omitted impairment was not accounted for in the
ALJ's RFC determination, or in other words, where the ALJ's step-two error prejudiced

the claimant at later steps in the sequential evaluation process, remand is required.  *See, e.g., Elliott v. Comm'r of Soc. Sec.*, No. 09-1195-HA, 2011 WL 1299623, at *4 (D. Or. Mar. 31, 2011) ("The general proposition that failures at step two may be harmless *if the ALJ discusses the impairments and assesses limitations as a result of that impairment*, . . ., underscores the significance of the error in this case—the ALJ failed to adequately discuss the impairments at issue, and a determination as to whether plaintiff's limitations were fully assessed in connection with these impairments is impossible to ascertain.") (emphasis added); *Sarver v. Comm'r of Soc. Sec.*, No. 07-11597, 2008 WL 3050392, at *14 n.7 (E.D. Mich. July 28, 2008) ("Admittedly, in some instances an improper Step Two omission serves to invalidate the entire decision."); *cf. Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (finding that any error ALJ committed in failing to list plaintiff's bursitis at step two was harmless, because the ALJ "extensively discussed" the bursitis and "considered any limitations posed by [it] at [s]tep 4").  Here, there is no indication that the ALJ considered Hudson's headaches in assessing her RFC.  Therefore, the ALJ's step two error was not harmless, and the matter should be remanded for a new decision starting at step two.

Even assuming *arguendo* that the ALJ's step-two error was harmless, the ALJ made other errors which warrant remand, as discussed in detail below.

## II.   The ALJ Erred in Determining that Hudson Could Perform Work at All Exertional Levels.

The ALJ determined that Hudson could perform the full range of work at all exertional levels.  (AR 16.)  Hudson claims that substantial evidence does not support this

determination.  She quotes from Social Security Ruling ("SSR") 96-8p, which states:

> When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity.

SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  As noted above, Hudson's disability application alleges that she became disabled as a result of her diabetes, manic depression/bipolar disorder, migraine headaches, and obesity.  (AR 167.)  Moreover, at the administrative hearing, Hudson testified that she could not work because of lower back and neck problems, heat exhaustion, tendonitis in her elbow, carpel tunnel syndrome in her wrist, diabetes in remission, weight problems, seizures, sleeping problems, migraine headaches, and problems with anger and manic depression.  (AR 41, 44-50.)

    Even assuming the propriety of the ALJ's determination that Hudson was not entirely credible in describing the intensity, persistence, and limiting effects of her symptoms, the record does not support a finding that Hudson could perform work at all exertional levels, including "very heavy,"[2] during the alleged disability period.  (*See* Doc. 9-1 at 3-13; Doc. 15 at 2-5.)  For example, records from Dartmouth-Hitchcock Medical Center, Ludlow Health Center, and Springfield Hospital, respectfully, demonstrate that Hudson was seen frequently during the period from February 2008 through May 2009 for various ailments, including but not limited to diabetes, hypertension, obesity, rash on her

---

[2]  The applicable regulation states that "[v]ery heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more."  20 C.F.R. § 404.1567(e).

feet, migraine headaches, acute viral pharyngitis, back pain, knee pain, chest pain, falls

due to seizures, and a sleep disorder.  (*See, e.g.,* AR 417 ("[c]omplaining of a lot of

bruising of abdomen" due to Insulin injections); AR 469 ("[symptoms] [p]ositive for

fatigue, occasional nosebleeds, and some shortness of breath with activity"); AR 470

("rash on her feet . . . looks like a very severe case of tinea pedis"); AR 479 ("in severe

distress [due to migraine headache]"); AR 486 ("has had sharp, stabbing . . . chest pain,"

"having difficulty taking/swallowing her meds"); AR 811 ("had multiple episodes of

'shaking' of hands and feet with loss of consciousness"); AR 934 ("knee pain is moderate

to severe[,] . . . characterized as a sharp stabbing . . . aggravated by any movement"); AR

936 ("[f]alls asleep very easily[, a]nywhere, anytime").)  Further, a glance at Hudson's

medication regimen during the relevant period reveals an individual with at least minimal

restrictions in her ability to work.  That regimen variously included the following

medications: Dilaudid, Spectazole Cream, terbinafine, NovoLog, Lantus Solostar,

Maxalt, Urea, Symlin, paroxetine, Aygestin, melatonin, TEGretol, Insulin, clindamycin,

simvastatin, Topamax, Protonix, Depo-SubQ Provera, metformin, ursodiol, Rozerem,

hydroxyzine, albuterol, EpiPen, thiamine, methocarbomol, Provigil, Norvasc, and

Prilosec.  (AR 564, 572, 574-75, 951, 954-55, 973-74, 981, 982-83, 1195-96, 1223-24.)

As Hudson reasonably argues, "[i]t is difficult to imagine someone in [Hudson's]

medication regimen performing work at all exertional levels, including strenuous work on

the[ir] feet all day long, as found by the ALJ."  (Doc. 9-1 at 21.)

   The Commissioner asserts that the ALJ's decision is supported by the opinions of

agency consultants Drs. Geoffrey Knisely and Leslie Abramson, who each opined – in

July 2008 and December 2008, respectively – that Hudson had no severe physical impairments and no limitations.  (AR 693, 756.)  But the ALJ did not cite to either of these opinions in her decision.  Furthermore, as Hudson points out, neither of these consultants reviewed the entire medical record, given that over five-hundred pages were added after they gave their opinions.  (*See* AR 758-1280.)  These additions to the record include medical reports documenting Hudson's sleep problems, seizures, and migraine headaches, among other things.  For example, in March 2009, Dr. Roslinde Collins recorded that Hudson "ha[s] symptoms consistent with cataplexy[3] and sleep paralysis." (AR 763.)  And in May 2009, Dr. Bujarski noted that Hudson's "[m]ost recent seizures" started on November 8, 2008, and involved loss of consciousness for up to several minutes, occasional big episodes and very frequent small episodes of shaking, eyes rolling in the back of her head, feelings of dizziness and weakness, headaches, unresponsiveness, and tremulousness, "at a rate of 2 to 3 times per week."  (AR 965.) The state agency consultants also did not have the opportunity to review Springfield Hospital records documenting, among other things, emergency room admissions for two episodes of unconsciousness in November 2008, and multiple seizures and migraines in April 2009.  (*See* AR 811, 817-20, 858-64, 869-75.)

**III.    The ALJ Erred in Her Analysis of the Opinion of PAC Forrest Williams.**

Next, Hudson claims that the ALJ failed to provide the required specificity in considering the opinion of certified physician's assistant ("PAC") Forrest Williams.  In

---

[3]  "Cataplexy" is defined as "[a] transient attack of extreme generalized weakness, often precipitated by an emotional response, such as surprise, fear, or anger; one component of the narcolepsy quadrad."  STEDMAN'S MEDICAL DICTIONARY 324 (28th ed. 2006).

August 2008, after noting that Hudson carried the diagnoses of bipolar disease,
depression, diabetes, migraine headaches, and obesity, which were being treated with
medications but were "not under total control," Williams opined that Hudson's "work
opportunities certainly would be limited," and she "would not be able to do anything
physical or strenuous."  (AR 678.)  He further opined that Hudson would "be able to do
some [sedentary-type] things on a limited basis."  (*Id.*)  The ALJ afforded little weight to
this opinion on the grounds that Williams "is not an acceptable medical source and his
opinion is not supported by the medical evidence of record."  (AR 19.)

      I find that Williams' opinion is in fact supported by the medical record, as
discussed above.  Moreover, although Williams is a physician's assistant and thus not an
"acceptable medical source" under the regulations, 20 C.F.R. § 416.913(a), his opinion
was still entitled to more consideration than the ALJ afforded to it.  Social Security
Ruling ("SSR") 06-03p specifies how ALJs should handle opinions from medical sources
other than "acceptable medical sources," stating: "Opinions from these [other] sources,
who are not technically deemed 'acceptable medical sources' under our rules, are
important and should be evaluated on key issues such as impairment severity and
functional effects, along with the other relevant evidence in the file."  SSR 06-03p, 2006
WL 2329939, at *3 (Aug. 9, 2006).  The ruling then directs ALJs to use the same factors
for the evaluation of opinions from "other sources," such as physician's assistants, as are
used to evaluate opinions from "acceptable medical sources," including treating
physicians.  *Id.* at *4 (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)).  These factors
include but are not limited to the length of the treatment relationship, the frequency of

evaluation, and the degree to which the medical source provided evidentiary support for his or her opinion. *Id.* The ALJ did not consider any of these factors in her opinion. In fact, the ALJ considered only whether Williams' opinion was consistent with the record, and even that analysis was cursory and lacking in evidentiary support or legal justification. Had the ALJ properly analyzed Williams' opinion, she would have noted that Williams and Hudson had a frequent treatment relationship, and that Williams' opinion was supported by his own treatment notes as well as by the medical record as a whole. (*See, e.g.,* AR 416-90, 584-613, 638-92, 887-947.)

## IV.   The Hypothetical Question Posed to the VE Did Not Account for All of Hudson's Limitations.

At the administrative hearing, the ALJ's hypothetical to the VE limited Hudson to "routine and repetitive tasks with brief and superficial contact with the general public, coworkers, and supervisors." (AR 60.) Hudson claims that the ALJ should have included in this hypothetical a "moderate" limitation in "concentration, persistence[,] or pace," which limitation (a) the ALJ assessed Hudson as having in step three of her decision (AR 16), and (b) agency consulting psychologist Dr. William Farrell opined Hudson had in his Psychiatric Review Technique report (AR 732, 739). (*See also* AR 592 (report of PAC Williams listing one of Hudson's symptoms as "[i]nability to [c]oncentrate (*sometimes*)); AR 1120 (report of Dr. Collins opining that Hudson "experiences symptoms that interfere with the attention and concentration needed to perform even simply work tasks, during a typical workday, . . . occasionally").)

An ALJ may rely on the testimony of a VE in response to a hypothetical question "only 'if the question accurately portrays [the plaintiff's] individual physical and mental impairments.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)); *see De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984). The Second Circuit explained: "The [VE's] testimony is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job." *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981). Although the Second Circuit has not yet weighed in on the issue of whether a hypothetical question to a VE must specifically account for a plaintiff's limitations in concentration, persistence, or pace in order to accurately portray the plaintiff's impairments; other circuits have addressed the issue and held in the affirmative on facts similar to those here.[4] For example, in *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009), the Seventh Circuit held as follows: "When an ALJ poses a hypothetical question to a vocational expert, the question must . . . account for documented limitations of 'concentration, persistence or pace.'" (Citations omitted.) The court in *Stewart* further held that restricting the hypothetical to the ability to do "simple, routine tasks that do not require constant interactions with coworkers or the general public" (as the ALJ in this case did: restricting the hypothetical to "routine and repetitive tasks with brief and superficial contact with the general public, coworkers, and supervisors" (AR 60)) does not accurately describe a

---

[4] Recently, this Court similarly held. *See Thibault v. Astrue*, No. 5:10-cv-188, 2011 WL 5024358, at *10-1 (June 20, 2011) (Conroy, M.J.), *Report and Recommendation adopted*, No. 5:10-cv-188, 2011 WL 5024460, at *4 (Oct. 20, 2011) (Reiss, C.J.)).

claimant's documented limitations in concentration, persistence, or pace. *Id.* at 685. The Seventh Circuit explained:

> The Commissioner asserts that the ALJ accounted for [the plaintiff's] limitations of concentration, persistence, and pace by restricting the inquiry to simple, routine tasks that do not require constant interactions with coworkers or the general public. We have rejected the very same contention before. In *Young v. Barnhart*, we held that a hypothetical with exactly those specifications did not adequately account for the plaintiff's medical limitations, including an "impairment in concentration." 362 F.3d at 1004. The Commissioner continues to defend the ALJ's attempt to account for mental impairments by restricting the hypothetical to "simple" tasks, and we and our sister courts continue to reject the Commissioner's position. In fact, the Social Security Administration itself rejects that position. SSR 85-15.

*Id.* at 684-85 (citations omitted).

Similarly, in *Winschel v. Commissioner of Social Security*, 631 F.3d 1176, 1180-81 (11th Cir. 2011), the Eleventh Circuit held that the ALJ erred by failing to either "explicitly include[]" or "implicitly account for" moderate limitations in maintaining concentration, persistence, and pace in a hypothetical to the VE; and failing to indicate that medical evidence suggested the claimant's ability to work was unaffected by this limitation. The court in *Winschel* further held that limitations to simple, routine tasks or to unskilled work would not, standing alone, typically suffice to account for a claimant's moderate limitations in concentration, persistence, or pace. *Id.* at 1180. As noted by the court in *Stewart*, many other circuits have similarly held. *See, e.g., Bowers v. Astrue*, 271 F. App'x 731, 733 (10th Cir. 2008); *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003); *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996).

Given this law, the ALJ in this case should have either explicitly included a "concentration, persistence, or pace" limitation in her hypothetical to the VE, or otherwise accounted for her own determination that Hudson had "moderate difficulties" in "concentration, persistence[,] or pace." (AR 16.)  For example, the ALJ could have stated in her decision that medical evidence supports a finding that Hudson could perform basic work activities in spite of her moderate limitation in concentration, persistence, or pace.  Or the ALJ could have implicitly accounted for this limitation in her hypothetical to the VE by instructing the VE to fully credit Dr. Farrell's or another medical provider's particular findings with respect to this limitation.  But instead, the ALJ failed to make findings sufficient for the Court to ascertain whether the minimal mental limitation included in both her RFC determination and her hypothetical question posed to the VE (i.e., the limitation to "routine and repetitive tasks") adequately encompassed Hudson's moderate limitations in concentration, persistence, or pace.  Had the ALJ's hypothetical implicitly or explicitly included all of the limitations which she assessed for Hudson, including the limitation in concentration, persistence, or pace, the VE's testimony about jobs Hudson was able to perform may have been different.[5]  Thus, the VE's testimony does not constitute substantial evidence to support the ALJ's findings that Hudson was capable of performing her past relevant work, and that alternatively, there are jobs existing in significant numbers in the national economy that Hudson can perform.

---

[5]  In fact, when asked to add to the hypothetical that the individual "would have unscheduled absences of at least two days a month," or that the individual "[would be] off task 10 minutes out of every hour," the VE testified that it would be "very likely" that such an individual would not be able to engage in substantial gainful activity without an accommodation.  (AR 64-65.)

The Commissioner asserts that the ALJ's RFC determination (which is reflected in the subject hypothetical question posed to the VE) properly addressed Hudson's particular deficiencies – including her moderate limitation in concentration, persistence, or pace – because that determination was based on Dr. Farrell's opinion regarding Hudson's individual mental RFC limitations, which opinion included a finding that Hudson was "moderate[ly]" limited in maintaining concentration, persistence, or pace (AR 739).  This assertion is unpersuasive for two reasons.  First, the issue is whether the hypothetical presented to the VE adequately accounted for Hudson's limitations, and it can neither be assumed that the VE was aware of Dr. Farrell's opinion and the ALJ's agreement therewith[6], nor that the VE equated "routine and repetitive tasks with brief and superficial contact with [others]" (which limitation was included in the hypothetical) with "moderate" limitations in concentration, persistence, or pace (which limitation was not included in the hypothetical).  Second, the ALJ did not include in her hypothetical to the VE or in her RFC determination Dr. Farrell's other relevant findings regarding Hudson's mental limitations, including his finding that Hudson "ha[d] sufficient concentration[,] persistence[,]and pace to sustain for [only] two[-]hour blocks of time through the work day and work week in low stress work activities."  (AR 745.)  Given the law stated

---

[6] Some circuits have held that a plaintiff's moderate limitation in concentration, persistence, and pace is adequately accounted for where the VE has independently learned of and presumably accounted for such limitation.  *See e.g. Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009) ("An exception to th[e] rule [requiring inclusion of the plaintiff's moderate limitation in concentration, persistence, and pace in the hypothetical to the VE] comes into play when the record indicates that the VE independently learned of the limitations (through other questioning at the hearing or outside review of the medical records, for example) and presumably accounted for them.  However, the exception does not apply if the record indicates that the VE's testimony was confined to the limitations set forth in the ALJ's hypothetical question.") (quotation marks and citation omitted).  There is no evidence of these facts existing here.

above, it cannot be assumed that the ALJ intended to account for these limitations merely by restricting Hudson to routine, repetitive tasks.

## Conclusion

For these reasons, I recommend that Hudson's motion (Doc. 11) be GRANTED, the Commissioner's motion (Doc. 15) be DENIED, and the matter be remanded for further proceedings and a new decision, in accordance with this opinion.

Dated at Burlington, in the District of Vermont, this 2nd day of November, 2011.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation. *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).